Robert D. Sherlock (02942)
**EISENBERG GILCHRIST & CUTT**
900 Parkside Tower
215 South State Street
Salt Lake City, Utah 84111
Telephone: (801) 366-9100
Email: rsherlock@egclegal.com

*Attorney for Relator*

---

# IN THE UNITED STATES DISTRICT COURT

## FOR THE DISTRICT OF UTAH CENTRAL DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA, *ex rel.* <br><br> RUSSELL PETERSON, <br><br>          Plaintiff-Relator, <br><br>   v. <br><br> UNIVERSAL HEALTH SERVICES, INC., SALT LAKE BEHAVIORAL HEALTH LLC; <br><br> JOHN DOES #1-100, FICTICIOUS NAMES <br>            Defendants. | **COMPLAINT** <br><br> **FILED IN CAMERA AND UNDER SEAL PURSUANT TO 31 U.S.C. § 3732. (False Claims Act)** <br><br><br> **CASE NO.:** _____ <br><br> Judge _____ <br><br> **JURY TRIAL DEMANDED** |

## INTRODUCTION

1.  On behalf of the United States of America, and pursuant to the *qui tam* provisions of the Federal False Claims Act, 31 U.S.C. §§ 3729-3733 Relator Russell Peterson M.S., CMHC, files this *qui tam* Complaint against Defendants Universal Health Services, Inc., and Salt Lake Behavioral Health, LLC, a Delaware based Limited Liability Company doing business as Salt Lake Behavioral Health, a freestanding inpatient psychiatric hospital located in Salt Lake City, Utah.

2.  This action concerns improper and unlawful submission of false claims to Federal healthcare payors including Medicare, Tricare, the Veteran's Administration Health Programs and the Federal Employees Health Benefits Program for inpatient psychiatric services including hospital services and physician services that were not medically necessary in their type, scope, and/or duration.

3. Relator discovered these violations in the course of his employment and interactions with physicians participating in these schemes and conducted his own investigations in furtherance of a False Claims Act *qui tam* action. He brings this action on behalf of the United States and the States to recover damages for the false claims that have been and continue to be submitted.

## I.

## JURISDICTION AND VENUE

4. This Court has federal subject matter jurisdiction over this action pursuant to 28 U.S.C. § 1331 and 31 U.S.C. § 3732.

2

5. This Court has personal jurisdiction over Defendants pursuant to 31 U.S.C. § 3732(a) because Defendants can be found in and transact business in this District. Additionally, this Court has personal jurisdiction over Defendants because acts prohibited by 31 U.S.C. § 3729 occurred in this District. 31 U.S.C. § 3732(a).

6. Venue is proper in this District pursuant to 31 U.S.C. § 3732(a) because Defendants transact business in this District and numerous acts proscribed by 31 U.S.C. § 3729 occurred in this District.

7. Relator's claims and this Complaint are not based upon allegations or transactions which are the subject of a civil suit or an administrative civil money penalty proceeding in which the Government is already a party, as enumerated in 31 U.S.C. § 3730(e)(3).

8. To the extent that there has been a public disclosure unknown to the Relator, Relator is the "original source" and meets the requirements under 31 U.S.C. § 3730(e)(4)(B). To the extent there has been a public disclosure of any facts or other matters relevant to this Complaint, Relator's allegations herein are based on his knowledge that is independent of and materially adds to the publicly disclosed allegations or transactions (if any) and meets the requirements under 31 U.S.C. § 3730(e)(4)(B).

## II.

## PARTIES

### RELATOR

9. Russell Peterson, M.S., Clinical Mental Health Counselor, graduated from Brigham Young University in Provo, Utah, has a Master's Degree in Psychology and has been licensed as

a Clinical Mental Health Counselor/Licensed Professional Counselor since 2004. He is a resident of Davis County, State of Utah. He holds an active license in the profession in both Idaho and Utah. Relator Russell Peterson commenced work on January 22, 2013, at Defendant Salt Lake Behavioral Health in the position of Admissions Director. In the position of Admissions Director, Relator Peterson was in charge of making decisions and supervising others who made decisions concerning admissions to Salt Lake Behavioral Health's inpatient units and other programs.

## DEFENDANTS

10. Defendant Salt Lake Behavioral Health, LLC, is a Delaware Limited Liability Company doing business as a freestanding 118 bed psychiatric hospital and outpatient facility, located in Salt Lake City, Utah. It was opened by Ascend Health Corporation. Ascend Health Corporation operated the defendant Salt Lake Behavioral Health hospital until Ascend Health Corporation was acquired in late 2012 by defendant Universal Health Services, Inc., in a cash purchase transaction. In doing so, Universal Health Services Inc. acquired nine owned or leased freestanding psychiatric facilities in Texas, Arizona, Utah, Oregon and Washington.

11. Defendant Universal Health Services, Inc., is a Delaware corporation and is the parent corporation of the other "Universal Health Services" named herein. For purposes of this complaint, all Universal Health Services entities will be referred to as UHS. Universal Health Services, Inc., as the parent corporation, files consolidated reports with the Securities and Exchange Commission, and refers to all of its subordinate entities as "we," "us," "our," and "the

4

company." All healthcare management operations are conducted by subsidiaries of Universal Health Service, Inc.

12. Defendant UHS of Delaware, Inc., is a Delaware Corporation headquartered in the State of Pennsylvania and doing business in Utah through its subsidiary Salt Lake Behavioral Health, LLC. All healthcare operations and management are conducted through UHS of Delaware, Inc., a subsidiary of Universal Health Services.

13. Defendants John Does #1-100, fictitious names, are unknown co-conspirators who together with the Named Defendants also participated in and/or conspired to perpetuate the scheme described herein. To the extent that any of the conduct or activities described in this Disclosure Statement and the accompanying Complaint in this matter were not performed by Defendants, but by the individuals described herein as John Does #1-100, fictitious names, the term "Defendants" shall also refer to John Does #1-100.

## III.

## STATUTORY AND REGULATORY PROVISIONS APPLICABLE TO DEFENDANTS' FALSE CLAIMS ACT VIOLATIONS

### A. THE FALSE CLAIMS ACT

14. The Federal False Claims Act provides that any person who knowingly presents or causes another to present a false or fraudulent claim for payment or approval is liable for a civil penalty of up to $11,000 for each such claim, plus three times the amount of the damages sustained by the Government. 31 U.S.C. § 3729(a)(1)(A)&(B).[1]

---

[1] To the extent conduct occurred in this Complaint before May 2009, False Claims Act 31 U.S.C. § 3729 (a)(1) and

## B. FEDERAL GOVERNMENT HEALTH PROGRAMS

15. The federal, state and local Governments, through their Medicaid, Medicare, Tricare, Veterans Administration and other Government healthcare payors, are among the principal payors for patients and users of Defendants' services.

16. Medicare is a federal Government health program primarily benefiting the elderly that Congress created in 1965 when it adopted Title XVIII of the Social Security Act. Medicare is administered by the Centers for Medicare and Medicaid Services ("CMS").

17. Tricare (formerly known as the Civilian Health and Medical Program of the Uniformed Services, or CHAMPUS) is the health care system of the United States military, designed to maintain the health of active duty service personnel and offer health care to non-active duty beneficiaries, including dependents of active duty personnel and career military retirees and their dependents. The program operates through various military-operated hospitals and clinics worldwide and is supplemented through contracts with civilian health care providers. Tricare is a triple-option benefit program designed to give beneficiaries a choice between health maintenance organizations, preferred provider organizations and fee-for-service benefits.

18. The Veterans Administration ("VA") provides health care and other benefits to veterans of the military through its nationwide network of hospitals and clinics. For most Veterans Administration referrals for inpatient psychiatric care, the Veterans Administration directly pays for said services.

---

(a)(2) are applicable.

19. The Federal Employees Health Benefits Program ("FEHBP") provides health insurance coverage for more than eight (8) million federal employees, retirees, and their dependents. FEHBP is a collection of individual health care plans, including the Blue Cross and Blue Shield Association, Government Employees Hospital Association, and Rural Carrier Benefit Plan. FEHBP plans are managed by the Office of Personnel Management. The funds of the United States Government are directly used in support of these programs through approximately $30 billion per year in premium subsidies to qualifying plans.

## C. MEDICARE REQUIREMENTS FOR PAYMENT OF CLAIMS (42 CFR 424.32)

### 1. Basic Requirements For Participation In The Medicare Program

20. In order to participate in the Medicare program, providers must enroll in the program, providing detailed information on ownership, credentials, education, licensure, and a number of other relevant items of information. In order to complete enrollment in the Medicare program, all providers of all types much complete a CMS form 855. Versions of the form exist for institutional providers (such as hospitals) (CMS 855A), clinics, group practices and certain other suppliers (CMS form 855b), physicians and non-physician practitioners (CMS 855i), and others. With respect to this complaint, Defendants' institutions could not have participated in the Medicare program without completing a CMS 855a.

21. A physician or non-physician practitioner including each such practitioner referenced in this compliant, would have, of necessity,  completed a CMS 855i in order to receive permission to have his or her services billed to the Medicare program.

7

22. In order to complete Medicare enrollment, each person submitting such an application is required to read, sign, and comply with the following certification:

> *I agree to abide by the Medicare laws, regulations and program instructions that apply to me or to the organization listed in Section 4A of this application. The Medicare laws, regulations, and program instructions are available through the fee-for-service contractor. I understand that payment of a claim by Medicare is conditioned upon the claim and the underlying transaction complying with such laws, regulations, and program instructions (including, but not limited to, the Federal anti-kickback statute and the Stark law), and on the supplier's compliance with all applicable conditions of participation in Medicare.*

23. Pursuant to the Consolidated Omnibus Budget Reconciliation Act of 1986, hospitals which participate in Medicare are also required to be participating hospitals in Tricare/CHAMPUS for inpatient services. For nearly all purposes, hospital reimbursement requirements and provision relating to Medicare are identical or very similar to those for Tricare.

24. Similarly, Veteran's Administration providers must be participating hospitals in the VA system and the system's requirements for payment also incorporate the same or nearly identical requirements.

### 2. Basic Requirements For All Claims

25. The Medicare requirements for the payment of claims are contained in 42 CFR Sec. 424.32, et.seq. Tricare/CHAMPUS requirements are contained in 32 CFR 199, et.seq. These regulatory provisions provide a basic, high level overview of requirements for the payment of claims, which are supplemented under regulatory authority under additional Medicare guidance contained in program memoranda, Medicare claims processing manuals, Medicare provider

manuals and the like. All participating physicians in the Medicare program receive copies of these documents or guidance on where to locate them in online sources.

26. Other payors including Tricare and Medicaid use identical or very similar provisions as guidance. Medicare provisions for the payment of claims including coding protocols, forms, and the like are considered industry standard in the health care industry.

(a) A claim must meet the following requirement (among others): A properly completed claim must be on a prescribed form (or electronic equivalent), signed by the beneficiary or on behalf of the beneficiary (in accordance with § 424.36 ). In submitting the claim form, the billing provider or entity certifies (among other certifications) as follows:

> *"I certify that the services shown on this form were medically indicated and necessary for the health of the patient and were personally furnished by me or were furnished incident to my professional service by my employee under my immediate personal supervision."*

27. Before the Medicare carriers accept electronically-submitted claims, each provider is required to complete an Electronic Data Interchange Enrollment Form (OMB 0938-0983). Each provider is required to agree in writing that it is responsible for the accuracy of the Medicare claims submitted on its behalf and that all claims submitted under its provider number will be accurate, complete and truthful.

### 3. Medical Necessity

28. Medicare prohibits payment for services that are not "reasonable and necessary for the diagnosis or treatment of illness or injury or to improve the functioning of a malformed body member." Under 42 U.S.C. § 1395y (a)(1)(A), and 42 U.S.C. § 1320c-5(a), the Medicare

program authorizes payment only for medical care that is "medically necessary" and of a quality that meets generally-accepted professional standards. Tricare contains similar requirements in 32 CFR 199.4-Basic Program Benefits.

### 4. Requirements for Inpatient Psychiatric Facilities (IPFs)

29. IPFs are certified under Medicare (and, therefore, Tricare) as inpatient psychiatric hospitals, which means, an institution that is primarily engaged in providing, by or under the supervision of a physician, psychiatric services for the diagnosis and treatment of mentally ill patients, maintains clinical records necessary to determine the degree and intensity of the treatment provided to the mentally ill patient, and meets staffing requirements sufficient to carry out active programs of treatment for individuals who are furnished care in the institution. The regulations at 42 C.F.R. § 412.402 define an IPF as a hospital that meets the requirements specified in 42 C.F.R. § 412.22 and 42 C.F.R. § 412.23(a), 42 C.F.R. § 482.60, 42 C.F.R. § 482.61, and 42 C.F.R. § 482.62. The Medicare Benefit Policy Manual, Chapter 2 - Inpatient Psychiatric Hospital Services, sets out both basic and specific requirements for Psychiatric Hospitals as a condition of payment. These include:

a. For all IPFs, a provisional or admitting diagnosis must be made on every patient at the time of admission, and must include the diagnosis of comorbid diseases as well as the psychiatric diagnosis.

b. The medical records maintained by an IPF must permit determination of the degree and intensity of the treatment provided to individuals who are furnished services in the institution, according to 42 C.F.R. § 412.27 and 42 C.F.R. § 482.61.

c. In addition, consistent with sound clinical practice, all medical records,

10

including progress notes and treatment plans, should be legible and complete, and should be promptly signed and dated by the person (identified by name and discipline) who is responsible for ordering, providing or evaluating the service furnished.

30. The Medicare Benefit Payment and Policy Manual also requires certification that the services furnished can reasonably be expected to improve the patient's condition or for diagnostic study. The certification is required at the time of admission or as soon thereafter as is reasonable and practicable. If continued hospitalization is required past 12 days the physician must re-certify that the services were and continue to be required for treatment that could reasonably be expected to improve the patient's condition, and that the patient continues to need, on a daily basis, active treatment furnished directly by or requiring the supervision of inpatient psychiatric facility personnel. In addition, the hospital records must show that services furnished were intensive treatment services, admission or related services, or equivalent services. "Active treatment" to justify inpatient psychiatric hospitalization is defined with specificity in the Medicare Payment Policy Manual.

31. Inpatient psychiatric facilities must meet specific requirements in terms of the treatment protocol, staffing, and activities for therapy specified in the Medicare benefits policy manual, as well as conditions of participation. Specifically, activities must be supervised and evaluated by a physician, a treatment plan must be recorded in the patient's medical record pursuant to 42 C.F.R. § 482.61, the personnel requirements of adequate qualified personnel and support staff set forth in 42 C.F.R. § 412.27 and 42 C.F.R. § 482.62 must be met, psychological

11

services must be available to meet patient needs as well as social services in accordance with 42

C.F.R. § 412.27 and 42 C.F.R. § 482.62.

## IV.

### DEFENDANTS' SCHEMES TO KNOWINGLY AND INTENTIONALLY SUBMIT FALSE CLAIMS FOR INPATIENT PSYCHIATRY SERVICES TO FEDERAL PAYORS

A. OVERVIEW AND BACKGROUND TO ALL SPECIFIC FRAUDULENT ACTS

32. Beginning in 2010 and continuing through at least June 2013, defendants devised a number of schemes at the Salt Lake Behavioral Health inpatient psychiatric hospital designed to enable defendants to bill and collect from payors, especially Federal payors, for a range of inpatient psychiatric services that did not meet criteria for medical necessity for the lengths of stays and, in many cases, for admission to the hospital at all.

33. Relator Russell Peterson commenced work on January 22, 2013, at Defendant Salt Lake Behavioral Health in the position of Admissions Director. He continued working until he was terminated from his position on June 16, 2013, approximately three weeks after delivering a letter to the executive management of Defendants detailing the inappropriate conduct in the practices detailed herein, including but not limited to the clear issues of failure to deliver appropriate services and maintain an environment of safety for both staff and patients.

34. In the position of Admissions Director, Relator Peterson was in charge of making decisions and supervising others who made decisions concerning appropriate and medically necessary admissions to Salt Lake Behavioral Health's inpatient units and other programs. Shortly after arrival at the facility, Relator Peterson noted with some alarm that various aspects

12

of the operation of the admissions department were not being undertaken as he had experienced in other facilities in his professional career.

35. In the course of Relator's employment at Defendant Salt Lake Behavioral Health, Relator became aware of intense corporate pressure to admit patients for lengths of stay exceeding those that were normal and usual/customary for the diagnoses and conditions for which admission was sought. The pressure took the form of accountability at morning "flash meetings" for admission decisions based on the financial status of the respective patient. Accountability was based solely on financial considerations such that if a patient was admitted who did not have insurance or preauthorization the Chief Financial Officer demanded accountability for that decision. Conversely, if a patient was not admitted who did have insurance, a similar inquiry was conducted.

36. The first anomalous situation he encountered was that a morning "flash meeting" was not being run as clinical meeting by clinical personnel. Rather, this morning "flash meeting" was run by the Chief Financial Officer and/or Chief Executive Officer. These morning meetings are, at other facilities, meetings in which the previous day's activity relating to admissions, discharges, and clinical operations are discussed. Rather, at these morning "flash meetings," the Chief Financial Officer reviewed the previous day's activities with respect to both calls to the facility and emergency room presentations, and required specific explanations if:

(1) A patient with insurance who presented to the emergency room or otherwise was not admitted to the facility, and

13

(2) If a patient who presented was without insurance but was nonetheless admitted to the facility.

37. Defendant Salt Lake Behavioral Health, in addition to a pattern and practice of admitting patients pursuant to an aggressive marketing and sales scheme irrespective of the medical necessity or propriety of such inpatient admission, also engaged in an aggressive and prolonged pattern and practice of altering, delaying, and manipulating patient lengths of stay based upon the extent of their insurance or third party payor coverage or benefits without regard to the medical necessity of that length of stay.

38. At the morning "flash meetings," the presiding officer (Chief Financial Officer) also obtained reports on planned discharges from inpatient care to discharges from other programs. The question was frequently or invariably posed as to whether or not the patient's insurance benefits had been "run out," i.e., or how many "days on the table" were available. This meant that the remaining number of days that had been authorized or were within the insurance coverage of the patient were "on the table" to be utilized. If there were no "days on the table," patients received substantially different treatment than if there were "days on the table." If the patient had remaining coverage days in their inpatient insurance program, they were to remain in the hospital until those benefits were exhausted.

30. On the Women's Unit, Adolescent Unit and Geriatric Unit, for example, clinical personnel were specifically instructed that if the patient was insured they should stay for seven to ten days or as long as there were still "days on the table." However, if a patient was not insured

14

clinical personnel were instructed to get the patient discharged and put "on the street" as soon as the patient was not a danger to him/herself or others. This was a matter of one to three days.

40. Discharges from treatment or discharge to a lower level of treatment (such as inpatient to outpatient follow-up) were scrutinized, and clinical decisions were overridden by the Chief Financial Officer. Questions were repeatedly asked as to whether or not a patient's insurance benefits had been used up. If benefits had not been exhausted, the patient was frequently retained in inpatient status until insurance benefits (either the "preauthorized" number of days, the "maximum annual benefit" under their payor's plan, or the "lifetime maximum" number of days) were used up. Relator Peterson overheard numerous conversations joking about how, for example, a Medicare patient "suddenly got better on Day Number 189;" Medicare has a 190-day lifetime maximum number of days' coverage in freestanding Psychiatric Hospitals.

41. Lengths of stay were thus controlled by the payor's "authorization" policy. Defendants made representations to the payor concerning the admission diagnosis and condition of the patient. Due to different administrative considerations, different payors would typically "preauthorize" care based on the admitting diagnoses up to different numbers of days.

42. For example, a private payor would typically authorize up to seven days of inpatient care before reauthorization was necessary. Medicare, due to its regulatory requirement of a recertification not later than the 12th day of admission, would typically authorize up to 12 days. Tricare, by contrast, would typically authorize a service to "be used within 30 days" in conformity with its regulatory guideline.

43. Further in the course of learning what his duties as Admissions Director were to be, great emphasis was placed on "marketing." Relator's duties, he learned during his employment, were supposed to include coordinating and allocating resources for marketing and referral development, providing "services" to referral sources to assure their satisfaction and continued association with Salt Lake Behavioral Health, collaborating with the Director of Business Development to implement and monitor target marketing plans, and similar marketing related duties.

44. In the course of Relator's duties and employment, and as he learned the operations as well as the vernacular of the institution, it became clear to Relator that his duties were to include aggressive admissions and retention policies irrespective of actual clinical medical necessity for admissions or retention in the facility.

    a. This was further reinforced by a communication from Salt Lake Behavioral Health management concerning this aggressive sales process. This information, documented in an "admissions action plan" which was effective May 6, 2013, used terminology used in the telemarketing industry to track "employee productivity."

    b. First, the document tracked "conversion" of calls to assessments. Relator was directed to run a daily "intake activity log" from Defendant Salt Lake Behavioral Health's computer system. This tracked each "intake" employee receiving calls to the institution to determine whether they successfully "sold" the caller on coming in for an assessment. Relator was directed to discuss the calls along with individual employee trends.

16

c. The institution indicated it would be training each employee on the effectiveness of "converting calls to scheduled assessments." Individual employees were to account for any call that did not end in a scheduled assessment.

d. This plan increased scrutiny over "conversion" of "assessments" to inpatient or other program admissions. Any decision to refer a patient for treatment outside Salt Lake Behavioral Health had to be made individually by the Relator or his co-admissions director.

e. These "conversions" of an assessment to an inpatient or other program admission were specifically tracked for sales effectiveness. A "training" was to be directed at "helping each employee own the assessment process and guiding the patient toward admission whenever possible."

45. In addition, at the beginning of each week, the Relator was directed to run an employee productivity report showing "conversion rates" of each employee. Every week each admissions coordinator was counseled on their "conversion rate" and what could be done to increase the conversion of any call to an intake assessment and any intake assessment to an inpatient or other admission. It should be noted that at no point in the admissions action plan was a careful assessment of medical necessity and propriety tracked, measured, and reviewed other than the issue of insurance coverage driving admissions decisions.

46. In addition to the above, each employee assured the verification of benefits and pre-certification approval for every call or admission at the time of intake. Each employee attending

17

the daily morning "flash meeting" was required to be knowledgeable of every call, assessment, referral outside the facility and precertification status on every admission.

**B. DEFENDANTS FALSELY, KNOWINGLY AND INTENTIONALLY EQUATED PAYOR PREAUTHORIZATION (I.E. FINANCIAL AVAILABILITY OF DAYS) WITH "MEDICAL NECESSITY.")**

47. Underlying these schemes was a corporate policy of intentionally, knowingly, and wrongfully equating payor "preauthorization" with a "medical necessity" determination. The Defendant facilities were encouraged to seek preauthorization for as long as possible and to obtain such preauthorization. Once preauthorization was obtained, Defendant Salt Lake Behavioral Health, as a matter of corporate policy and with the approval and direction of its corporate officers, retained patients as long as authorization could continue to be obtained regardless of the actual medical necessity of continuing inpatient admission for said patient.

48. Preauthorization is not the same as a determination of medical necessity for a continuing stay, even within the number days preauthorized at admission. In obtaining preauthorization, in mental health inpatient services, the preauthorization is obtained by a telephone consult, usually with a payor's nurse preauthorization personnel, by the intake or admitting provider or office.

49. In the course of his duties, Relator Peterson and his department were tasked with obtaining the initial preauthorization. This would be based only on the admitting diagnosis from Relator Peterson's department and the initial intake. There was, of course, no way to determine the actual course of treatment at any given time. The "preauthorization" for a number of days by

18

the payor was not and could not be a determination of the continuing medical necessity of the stay. It is ONLY that the patient appeared to qualify for inpatient admission as of the time of the preauthorization based on the representations of the admitting facility.

## C. DEFENDANTS DEVELOPED TARGETED MARKETING TO MILITARY UNITS AND MILITARY MENTAL HEALTH PROVIDERS TO FILL DEFENDANTS' TRICARE-SPECIFIC UNIT WITH MEDICALLY UNNECESSARY AND PRE-PRESCRIBED LENGTHS OF STAY

50. In order to maximize its flow of military patients, UHS engaged in an aggressive marketing campaign that included the training of "military liaisons" to visit military bases, military medical treatment facility commanders, military treatment facility clinicians and other referral sources to market its "patriot support program." This training mirrored very closely the marketing training that would be utilized by a pharmaceutical sales representative or medical device company representative. The liaisons were instructed to become highly knowledgeable about psychiatric care, the facility that they were visiting, and learn to speak "military lingo" and be knowledgeable about current military events. Target lists were created. Other training included how to prioritize and schedule visits, including the highest ranking behavioral/mental health leader in the military medical treatment facility, MTF department heads, wounded warrior units, base leadership, hospital leadership, and local physicians treating family members. Power point presentations were created, individual meetings followed up and other aggressive sales tactics were employed.

51. As a result, military units were encouraged to send patients to Defendants' facility

19

even if those admissions met no medical necessity criteria, and had no expectation that the inpatient admission would be result in an improvement in the patient's condition.

52. In furtherance of its scheme to retain inpatients for lengths of stay irrespective of the medical necessity for that length of stay, Defendant Salt Lake Behavioral Health created marketing and patient information material prescribing the length of stay for military personnel irrespective of diagnosis and irrespective of the medical necessity of that length of stay. As part of its "welcome packet" for its "Freedom Care" military program, Salt Lake Behavioral Health flatly stated that "our Freedom Care specialized military program require {sic} a 4-6 week length of stay. Programs for family members and veterans vary."

53. This document was signed by the Director of Clinical Services, on behalf of Defendant Salt Lake Behavioral Health.

54. By contrast, other military specific treatment programs do not prescribe a fixed length of stay; rather the patient arrives, is assessed, and his/her progress is evaluated.

**D. DEFENDANTS KNOWINGLY AND INTENTIONALLY CREATED FALSE RECORDS TO SUPPORT MEDICALLY UNNECESSARY ADMISSIONS AND LENGTHS OF STAY**

55. In order to effectuate this utilization of "days on the table," clinical personnel were instructed, directed and pressured to create false records and documents in order to justify the admission and continued retention of a patient. These false documents and records included the following:

(a). **Charting to the negative.**" Charting to the negative meant that, from the time a patient presented to the institution and throughout the patient's stay, personnel throughout

20

the institution were required to produce chart notes and diagnoses to paint as negative a picture of the patient's mental health condition as possible, omitting or minimizing positive aspects of their condition. For example, if a patient presented with depression, clinicians would uniformly chart it as "major depression." If a patient presented with a history of depression, the history of "major depression" would be noted; however, if this depression had been well-managed on medication and the patient had been stable for a long period of time, these moderating factors would not be charted. Patients' progress in therapy would be minimized and the condition would routinely not be shown to be resolving until just before the patient's insurance ran out. Thus, clinicians' medical records, both individually and taken as a whole, routinely present a false and misleading picture of the patient's condition and progress during hospitalization or other therapy. Defendant, Salt Lake Behavioral Health's medical record system fails to have any integrity with respect to the actual status of patients treated at the institution.

 **(b). <u>Discharge planning done by revenue management:</u>** The discharge planning calendars, showing the date of planned discharge, etc., were produced by "utilization review" for presentation at morning planning meetings. Utilization review at Salt Lake Behavioral Health is a revenue planning function. During Relator's tenure, the revenue planner in charge of producing the discharge planning and calendar was Shad Crookston, who reported directly to the Chief Financial Officer, Scott Miller.

 **(c). <u>Altering Diagnoses:</u>** Directions from executive management including executive clinical management, to actually change diagnoses or alter diagnoses in order to justify longer lengths of stay. On numerous occasions, clinical personnel on the treating units were

required to alter diagnoses that had been developed by interdisciplinary teams in order to justify lengths of stay.

      **(d).**   **Backdating times of admission:** Admission personnel were routinely instructed to backdate the time of admission for "middle of the night" admissions. If a patient presented to the emergency room or presented for evaluation in the late evening, but the admission decision was not done until past midnight the time of admission would routinely be backdated to 11:59 p.m. This is because the day of admission (up until 12:00 midnight) is a compensable day. The day of discharge is not a compensable day. Thus, by backdating an admission to 11:59 p.m. or before, another "day on the table" was taken and would be paid by Medicare and other federal payors.

## E. DEFENDANTS FALSELY, KNOWINGLY AND INTENTIONALLY DEMANDED AND ENCOURAGED THE WRONGFUL AND UNLAWFUL USE OF INVOLUNTARY COMMITMENT PROCESSES UNDER UTAH LAW.

      56. At the direction of executive management, clinical personnel were instructed to utilize the Utah Substance Abuse and Mental Health Act, Temporary and Involuntary Commitment proceedings, (U.C.A. §§ 62A-15-629, and 631) to admit, and retain a person otherwise not needing this involuntary treatment but who had insurance benefit coverage. These commitment certifications are printed on different colored paper and thus are known as "blue sheets" or "pink sheets." The blue sheet is Utah DSA and MH form 34-1; the pink sheet is DSA MH form 34-2. These forms require certification in order to involuntarily retain or admit an individual and must be certified by a physician, medical officer of the United States Government,

or a designated mental health examiner as appointed by the Utah Division of Substance Abuse and Mental Health.

57. The authority of the Mental Health examiners and physicians employed by and under the direction of Defendant Salt Lake Behavioral Health was utilized on the orders and instruction of the financial officer. In one encounter, the Chief Financial Officer informed a clinical therapist that "you have pink sheet authority, don't you? Well, use it!" Based on Relator's information and specific information learned in the course of investigation this medical examiner authority was used to keep patients after their clinical team had in fact determined that they were not only not eligible for involuntary commitment but were actually ready for discharge from the hospital.

58. On numerous occasions, when presented with the number of discharges from inpatient therapy planned for the day, the Chief Financial Officer would state "that's going to leave me too many empty beds; go back and change it," or words to that effect. Accordingly, discharge plans were changed to keep on inpatient status patients who were actually ready for discharge from inpatient care. Relator personally observed these instructions being given and was aware from his personal experience that patients planned for discharge from units were retained longer than medically necessary based upon these financial considerations.

**V.**

**DEFENDANTS' POLICIES AND ACTIONS RESULTED IN
MEDICALLY UNNECESSARY LENGTHS OF STAY FOR WHICH CLAIMS WERE
SUBMITTED TO GOVERNMENT PAYORS**

59. An analysis of the lengths of stay, based on information Relator Peterson received in the ordinary course of his duties at Salt Lake Behavioral Health, reflects that across all diagnoses

23

patients stayed for inordinately different lengths of time depending on who the payor was. This is reflective not of different needs for intensity of service, but different amounts of time that payors "preauthorized" as the outside limit for treatment.

    a. During the last full week of January 2013 and through the first full weeks of April 2013, patients who were insured by private payors stayed an average of 7.8 days at Defendant Salt Lake Behavioral Health.

    b. Those who were self-pay, i.e., responsible for their own bill without insurance, stayed an average of only 5.9 days

    c. Patients whose payor was the Veteran's Administration stayed 34.0 days.

    d. Patients whose payor was Medicare stayed an average of 16.8 days, or twice as long as private payor patients.

    e. Patients whose payor was Tricare (including active-duty across all diagnoses, and diagnoses *not specific to the military milieu*, i.e., post-traumatic stress syndrome or post deployment issues), stayed an average of 32.7 days.

60. By contrast, data from the Department of Health and Human Services from fiscal year 2013, (CMS -1588-F Table 5) indicates that for diagnosis related group (DRG 885-psychoses) accounting for 75% of all Medicare discharges, the average length of stay was 7.4 days. Across all psychiatric diagnosis related groups excluding drug and alcohol abuse or dependence, the average is 5.4 days. For drug and alcohol abuse including rehabilitation therapy, the Medicare average is 8.8 days. These gross disparities in lengths of stay, driven by payor source, are illustrated in the following table:

## SALT LAKE BEHAVIORAL HEALTH LENGTHS OF STAY

| | ALOS DAYS | SLBH ALOS EXCESS DAYS VERSUS MEDICARE ALOS | SLBH ALOS EXCESS DAYS VERSUS SLBH PRIVATE PAYORS | SLBH ALOS EXCESS DAYS VERSUS SLBH SELF-PAY |
|---|---|---|---|---|
| MEDICARE NATIONAL AVERAGE FOR MOST COMMON DRG | 7.4 | | | |
| SLBH MEDICARE | 16.8 | 9.4 | 9 | 16.8 |
| SLBH TRICARE | 32.7 | 25.3 | 24.9 | 26.8 |
| SLBH VA | 34 | 26.6 | 26.2 | 28.1 |
| SLBH PRIVATE PAYORS | 7.8 | 0.4 | | |
| SLBH SELF-PAY | 5.9 | -1.5 | | |

(** ALOS is an abbreviation for "Average Length of Stay")

61. Underlying and motivating these schemes was the payment structure for inpatient psychiatric care of the Tricare, Medicare and VA services. Under the Medicare inpatient prospective payment system (IPPS) for mental health, hospitals are paid a daily rate (of approximately $700 to $1000 per day) for inpatient psychiatric care. Tricare similarly pays on a per diem basis, the Veterans Administration pays directly from VA funds for veterans needing inpatient psychiatric care.  Based upon Relator's personal knowledge defendant UHS actively

61. Underlying and motivating these schemes was the payment structure for inpatient psychiatric care of the Tricare, Medicare and VA services. Under the Medicare inpatient prospective payment system (IPPS) for mental health, hospitals are paid a daily rate (of approximately $700 to $1000 per day) for inpatient psychiatric care. Tricare similarly pays on a

25

per diem basis, the Veterans Administration pays directly from VA funds for veterans needing inpatient psychiatric care. Based upon Relator's personal knowledge defendant UHS actively sought, solicited and marketed to these populations because of the nature of their authorization and preauthorization system and their payment methodologies.

62. Relator is informed and believes, and on the basis of evidence alleges, that for each patient admitted to and discharged from the Defendants' facilities, Defendants submitted claims to the United States Government and/or its healthcare payors and contractors for the days admitted to the facility. Said claims and bills were submitted regardless of the medical necessity of the length of stay in the facility. Defendants further received payment for the lengths of stay and closely tracked any "uncompensated days" or days for which care was denied by a payor. For example , in the daily "discharge calendars" provided to Relator , Defendants tracked each patient and its payor status by a column entitled "unpaid days". As a result, it is clear that defendants submitted claims for, and received payment for, claims submitted to Federal payors including but not limited to Medicare, Tri-care, the Veterans Administration, and others.

## A. SPECIFIC EXAMPLE OF PAYMENT SOURCES DETERMINING QUALITY OF TREATMENT RECEIVED

63. During January and February 2013, patients B, C and D were admitted to defendant facilities. Two of the cases involved adults, one involved a juvenile. Following admission to the facility, the Chief Financial Officer of SLBH contacted Relator and his section to demand that admission personnel call Wyoming Medicaid to determine if payment would be forthcoming and stated  "because that will directly impact the kind of care they receive." These patients stayed for

9, 11, and 13 days respectively, before being transferred to other facilities or discharged to the care of other physicians.

**B. SPECIFIC EXAMPLE: MEDICALLY UNNECESSARY ADMISSION OF TRICARE PATIENT**

64. As an example of this aggressive marketing and its results, patient L.A. was admitted to Defendant hospital on April 5, 2013, from an active-duty military base on the Southeast coast. Patient L.A. had been discharged from an inpatient stay at another psychiatric facility on April 4, 2013, with a discharge summary noting that the patient was not psychotic, not actively suicidal, not likely to injure herself, was not cooperative with treatment and had failed to respond to intensive treatment both on an outpatient and inpatient basis, likely due to secondary gain of being in the role of an "impaired person" and unwilling and unable to take any responsibility for her issues or behaviors. Despite this discharge summary, which was from another United Health Service facility, the patient was accepted for admission at Defendant Salt Lake Behavioral Health, flown to Salt Lake City with an escort and admitted with a diagnosis of major depressive disorder and personality disorder NOS (not otherwise specified), a designation used when a diagnosis does not fit precisely within the DSM. Thus the patient was accepted with no reasonable prognosis (based upon the previous discharge summary) of clinical improvement, no evidence that the patient could not be managed on an outpatient basis, and was admitted to the "Freedom Care" unit at Defendants' facility.

## VI. CLAIMS FOR RELIEF

### COUNT I – VIOLATION OF 31 U.S.C. § 3729(a)(1)(A)

65. Relator incorporates by reference Paragraphs 1-64 of this Complaint as though the

same were set forth herein at length.

66. Defendants knowingly, in reckless disregard and/or in deliberate ignorance of the truth presented and/or caused to be presented false and fraudulent claims for payment and approval for services provided to patients insured by federally-funded health insurance programs, including Medicare, when they submitted claims for payment and approval to CMS for services that were prohibited to be billed due to lack of medical necessity as defined under 42 C.F.R. § 482.61 and § 482.62, and 42 C.F.R. § 412.27.

67. CMS and other Federal health care program administrators, unaware of the falsity of the claims and statements made or caused to be made by the Defendants, and in reliance on the accuracy of these claims and statements, paid for these services.

68. All such false records were material to the Government's decision to pay for such services. Had the Government known that the bills presented or caused to be presented by Defendants for payment were false and misleading; payments may not or would not have been made for such claims.

69. As a result of these schemes, Defendants caused Medicare, Tricare, the Veterans Administration and other government payors to incur significant damage and those damages are continuing to accrue.

## COUNT II – VIOLATION OF 31 U.S.C. § 3729(a)(1)(B)

70. Relator incorporates by reference Paragraphs 1-64 of this Complaint as though the same were set forth herein at length.

71. Defendants knowingly, in reckless disregard and/or or in deliberate ignorance of the

truth made, used and/or caused to be made or used, a false record and statements material to a false and fraudulent claim to obtain approval and payment from the Government when they submitted claims for payment and approval, in creating the billing records, medical records, and other physical and electronic records and transmittals reflecting services that were prohibited to be billed due to lack of medical necessity as defined under 42 C.F.R. § 482.61 and 482.62, and 42 C.F.R. § 412.27.

72. CMS and other Federal health care program administrators, unaware of the falsity of the claims and statements made or caused to be made by the Defendants, and in reliance on the accuracy of these claims and statements, paid services provided to patients insured by federally-funded health insurance programs, including Medicare, Tricare and the Veterans Administration, that were prohibited to be billed due to lack of medical necessity as defined under 42 C.F.R. § 482.61 and 482.62, and 42 C.F.R. § 412.27.

73. All such false records were material to the Government's decision to pay for such services. Had the Government known that the bills presented or caused to be presented by Defendants for payment were false and misleading; payments may not or would not have been made for such claims.

74. Defendants did not disclose their intentional non-compliance with requirements in the claims, forms, or other information they submitted to CMS.

75. As a result of these schemes, Defendants caused Medicare, Tricare, the Veterans Administration and other government payors to incur significant damage and those damages are continuing to accrue.

29

## COUNT III – VIOLATION OF 31 U.S.C. § 3729(a)(1)(C)

76. Relator incorporates by reference Paragraphs 1-64 of this Complaint as though the same were set forth herein at length.

77. Defendants knowingly, in reckless disregard and/or in deliberate ignorance of the truth conspired between themselves with their employees and administrators, and others, to present and/or cause to be presented false and fraudulent claims for payment and approval for services delivered or purported to be delivered to patients insured by federally-funded health insurance programs, including Medicare, Tricare, the Veteran's Administration, and other federal programs.

78. CMS and other Federal health care program administrators, unaware of the falsity of the claims and statements made or caused to be made by the Defendants, and in reliance on the accuracy of these claims and statements, paid services provided to patients insured by federally-funded health insurance programs, including Medicare, Tricare and the Veteran's Administration that were prohibited to be billed by the due to lack of medical necessity as defined under 42 C.F.R. § 482.61 and 482.62, and 42 C.F.R. § 412.27.

79. As a result of the conspiracy, Defendants caused Medicare, Tricare, the Veteran's Administration and other government payors to incur significant damage and those damages are continuing to accrue.

### VII. PRAYER FOR RELIEF

80. WHEREFORE, Plaintiffs/Relator, acting on behalf of and in the name of the United States, demands and prays that judgment be entered in favor of the United States against each

Defendant, jointly and severally, as follows:

A.   The amount of the United States' damages in an amount to be proven at trial;

B.   Treble the amount of the United States' damages in an amount to be proven at trial;

C.   Civil penalties of $11,500 for each false claim submitted, especially in view of the fact that the Defendants' fraud is so egregious as to justify debarment from all federal health care programs;

D.   Reasonable costs and attorney's fees;

E.   The maximum allowed to Relators under 31 U.S.C. § 3730(d);

F. Such other and further relief as this Court deems to be just and proper.

## VIII. REQUEST FOR TRIAL BY JURY

81. Jury trial requested .

DATED this 8   day of August, 2014.

Respectfully submitted,

_____

Robert D. Sherlock (02942)
**EISENBERG, GILCHRIST & CUTT**
215 South State Suite 900
Salt Lake City, Utah 84111
Telephone: 801-366-9100
Facsimile: 801-350-0065
rsherlock@egclegal.com

31

## CERTIFICATE OF SERVICE

I hereby certify that, in accordance with F.R. Civ. P. 4(i) and the requirements of 31 U.S. Code 3730(b)(2), and 28 C.F.R. 0.77(i), on this ____ day of _____, 2014, I mailed, via registered United State Mail, a copy of the foregoing Complaint together with any exhibits thereto, to the following:

United States Department of Justice-
Attorney General of The United States
C/O Assistant Attorney General for Administration, Justice Management Division
950 Pennsylvania Ave. NW, Room 1111
Washington, D.C. 20530

And hand- delivered or caused to be hand-delivered the same to the following:

Hon. Carlie Christensen
Acting United States Attorney for the District of Utah
Attn: Civil Frauds/ False Claims
185 So. State Street
Salt Lake City, UT 84111

_____

JS 44 (Rev. 12/12)

# CIVIL COVER SHEET

The JS 44 civil cover sheet and the information contained herein neither replace nor supplement the filing and service of pleadings or other papers as required by law, except as provided by local rules of court. This form, approved by the Judicial Conference of the United States in September 1974, is required for the use of the Clerk of Court for the purpose of initiating the civil docket sheet. *(SEE INSTRUCTIONS ON NEXT PAGE OF THIS FORM.)*

### I. (a) PLAINTIFFS
United States  ex rel  PETERSON, RUSSELL

**DEFENDANTS**
Universal Health Services, Inc.; Salt Lake Behavioral Health, LLC;
DOES #1-100, FICTICIOUS NAMES

**(b)** County of Residence of First Listed Plaintiff _____
*(EXCEPT IN U.S. PLAINTIFF CASES)*

County of Residence of First Listed Defendant   Salt Lake
*(IN U.S. PLAINTIFF CASES ONLY)*
NOTE:  IN LAND CONDEMNATION CASES, USE THE LOCATION OF
THE TRACT OF LAND INVOLVED.

**(c)** Attorneys *(Firm Name, Address, and Telephone Number)*
Robert D. Sherlock
Eisenberg, Gilchrist & Cutt, 215 So. State, Suite 900,
Salt Lake City, UT 84111     (801) 366-9100

Attorneys *(If Known)*

**FILED**
DISTRICT COURT
AUG 8  2: 50
DISTRICT OF UTAH
SEALED
DEPUTY CLERK

### II. BASIS OF JURISDICTION *(Place an "X" in One Box Only)*

☒ 1  U.S. Government Plaintiff
☐ 2  U.S. Government Defendant
☐ 3  Federal Question  *(U.S. Government Not a Party)*
☐ 4  Diversity  *(Indicate Citizenship of Parties in Item III)*

### III. CITIZENSHIP OF PRINCIPAL PARTIES *(Place an "X" in One Box for Plaintiff and One Box for Defendant)*
*(For Diversity Cases Only)*

|  | PTF | DEF |  | PTF | DEF |
|---|---|---|---|---|---|
| Citizen of This State | ☐ 1 | ☐ 1 | Incorporated or Principal Place of Business In This State | ☐ 4 | ☐ 4 |
| Citizen of Another State | ☐ 2 | ☐ 2 | Incorporated and Principal Place of Business In Another State | ☐ 5 | ☐ 5 |
| Citizen or Subject of a Foreign Country | ☐ 3 | ☐ 3 | Foreign Nation | ☐ 6 | ☐ 6 |

### IV. NATURE OF SUIT *(Place an "X" in One Box Only)*

| CONTRACT | TORTS | FORFEITURE/PENALTY | BANKRUPTCY | OTHER STATUTES |
|---|---|---|---|---|
| ☐ 110 Insurance | **PERSONAL INJURY** / **PERSONAL INJURY** | ☐ 625 Drug Related Seizure of Property 21 USC 881 | ☐ 422 Appeal 28 USC 158 | ☒ 375 False Claims Act |
| ☐ 120 Marine | ☐ 310 Airplane / ☐ 365 Personal Injury - Product Liability | ☐ 690 Other | ☐ 423 Withdrawal 28 USC 157 | ☐ 400 State Reapportionment |
| ☐ 130 Miller Act | ☐ 315 Airplane Product Liability / ☐ 367 Health Care/ Pharmaceutical |  |  | ☐ 410 Antitrust |
| ☐ 140 Negotiable Instrument | ☐ 320 Assault, Libel & Slander / Personal Injury Product Liability |  | **PROPERTY RIGHTS** | ☐ 430 Banks and Banking |
| ☐ 150 Recovery of Overpayment & Enforcement of Judgment | ☐ 330 Federal Employers' Liability / ☐ 368 Asbestos Personal Injury Product Liability |  | ☐ 820 Copyrights | ☐ 450 Commerce |
| ☐ 151 Medicare Act | ☐ 340 Marine |  | ☐ 830 Patent | ☐ 460 Deportation |
| ☐ 152 Recovery of Defaulted Student Loans (Excludes Veterans) | ☐ 345 Marine Product Liability / **PERSONAL PROPERTY** |  | ☐ 840 Trademark | ☐ 470 Racketeer Influenced and Corrupt Organizations |
| ☐ 153 Recovery of Overpayment of Veteran's Benefits | ☐ 350 Motor Vehicle / ☐ 370 Other Fraud | **LABOR** | **SOCIAL SECURITY** | ☐ 480 Consumer Credit |
| ☐ 160 Stockholders' Suits | ☐ 355 Motor Vehicle Product Liability / ☐ 371 Truth in Lending | ☐ 710 Fair Labor Standards Act | ☐ 861 HIA (1395ff) | ☐ 490 Cable/Sat TV |
| ☐ 190 Other Contract | ☐ 360 Other Personal Injury / ☐ 380 Other Personal Property Damage | ☐ 720 Labor/Management Relations | ☐ 862 Black Lung (923) | ☐ 850 Securities/Commodities/ Exchange |
| ☐ 195 Contract Product Liability | ☐ 362 Personal Injury - Medical Malpractice / ☐ 385 Property Damage Product Liability | ☐ 740 Railway Labor Act | ☐ 863 DIWC/DIWW (405(g)) | ☐ 890 Other Statutory Actions |
| ☐ 196 Franchise |  | ☐ 751 Family and Medical Leave Act | ☐ 864 SSID Title XVI | ☐ 891 Agricultural Acts |
|  |  | ☐ 790 Other Labor Litigation | ☐ 865 RSI (405(g)) | ☐ 893 Environmental Matters |
| **REAL PROPERTY** | **CIVIL RIGHTS** / **PRISONER PETITIONS** | ☐ 791 Employee Retirement Income Security Act |  | ☐ 895 Freedom of Information Act |
| ☐ 210 Land Condemnation | ☐ 440 Other Civil Rights / **Habeas Corpus:** |  | **FEDERAL TAX SUITS** | ☐ 896 Arbitration |
| ☐ 220 Foreclosure | ☐ 441 Voting / ☐ 463 Alien Detainee |  | ☐ 870 Taxes (U.S. Plaintiff or Defendant) | ☐ 899 Administrative Procedure Act/Review or Appeal of Agency Decision |
| ☐ 230 Rent Lease & Ejectment | ☐ 442 Employment / ☐ 510 Motions to Vacate Sentence |  | ☐ 871 IRS—Third Party 26 USC 7609 | ☐ 950 Constitutionality of State Statutes |
| ☐ 240 Torts to Land | ☐ 443 Housing/ Accommodations / ☐ 530 General |  |  |  |
| ☐ 245 Tort Product Liability | ☐ 445 Amer. w/Disabilities - Employment / ☐ 535 Death Penalty |  |  |  |
| ☐ 290 All Other Real Property | ☐ 446 Amer. w/Disabilities - Other / **Other:** | **IMMIGRATION** |  |  |
|  | ☐ 448 Education / ☐ 540 Mandamus & Other | ☐ 462 Naturalization Application |  |  |
|  | ☐ 550 Civil Rights | ☐ 465 Other Immigration Actions |  |  |
|  | ☐ 555 Prison Condition |  |  |  |
|  | ☐ 560 Civil Detainee - Conditions of Confinement |  |  |  |

### V. ORIGIN *(Place an "X" in One Box Only)*
☒ 1 Original Proceeding  ☐ 2 Removed from State Court  ☐ 3 Remanded from Appellate Court  ☐ 4 Reinstated or Reopened  ☐ 5 Transferred from Another District *(specify)*  ☐ 6 Multidistrict Litigation

### VI. CAUSE OF ACTION
Cite the U.S. Civil Statute under which you are filing *(Do not cite jurisdictional statutes unless diversity)*:
31 U.S.C. §§3729 and 3730 et seq.,
Brief description of cause:
Fraudulent Billing of Medicare for Medically Unnecessary Services

### VII. REQUESTED IN COMPLAINT:
☐ CHECK IF THIS IS A CLASS ACTION UNDER RULE 23, F.R.Cv.P.
DEMAND $
CHECK YES only if demanded in complaint:
JURY DEMAND:  ☒ Yes  ☐ No

### VIII. RELATED CASE(S) IF ANY
*(See instructions)*
JUDGE _____  DOCKET NUMBER _____

DATE  08/08/2014
SIGNATURE OF ATTORNEY OF RECORD

**FOR OFFICE USE ONLY**
RECEIPT # _____  AMOUNT _____  APPLYING IFP _____

Case: 2:14cv00582
Assigned To : Pead, Dustin B.
Assign. Date : 8/8/2014
Description: SEALED v. SEALED